This Opinion Is a
Precedent of the TTAB

Hearing:
December 7, 2016

Mailed:
June 21, 2017

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

*Executive Coach Builders, Inc.*
*v.*
*SPV Coach Company, Inc.*
_____

Opposition No. 91212312
_____

Richard L. Schnake, Daniel K. Wooten, and Bryan D. Fisher of Neale & Newman, L.L.P., for Executive Coach Builders, Inc.

Rebeccah Gan of Wenderoth, Lind & Ponack L.L.P., for SPV Coach Company, Inc.

_____

Before Wolfson, Hightower, and Lynch,
Administrative Trademark Judges.

Opinion by Hightower, Administrative Trademark Judge:

SPV Coach Company, Inc. ("Applicant") seeks to register the mark ARMBRUSTER STAGEWAY (in standard characters) on the Principal Register for "vehicles, namely, customized limousines" in International Class 12.[1] Executive Coach Builders, Inc. ("Opposer") opposes registration under Section 2(d) of the

---

[1] Application Serial No. 85794162 was filed December 4, 2012, under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), based on Applicant's allegation of a *bona fide* intention to use the mark in commerce.

Trademark Act, 15 U.S.C. § 1052(d), asserting priority and a likelihood of confusion with its pleaded common-law mark ARMBRUSTER/STAGEWAY, which, as can be seen, differs from Applicant's mark by the use of a forward slash, rather than a space, between the two words. Applicant, in turn, asserts as an affirmative defense that Opposer "has abandoned its ARMBRUSTER/STAGEWAY mark and is without valid rights upon which it may state a claim upon which relief can be granted."[2] The parties in this opposition are secondary manufacturers of the types of specialty vehicles at issue in this case – stretch limousines and hearses, for the VIP and funeral markets – made from vehicle chassis manufactured by others, such as Cadillacs and Lincolns.[3]

The case is fully briefed, and an oral hearing was held on December 7, 2016.

We dismiss the opposition.

## I. Evidentiary Objections

Applicant objects to admission of passages of testimony from Opposer's three witnesses and two Internet printouts submitted with Opposer's notice of reliance, and also moves to strike Opposer's rebuttal notice of reliance in its entirety.

We have considered each objection. Some concern the weight due the evidence rather than its admissibility, and none is to evidence material to our outcome-determinative findings of fact. We have accorded the testimony and evidence whatever probative value it merits, keeping Applicant's objections in mind, and comment as needed on its probative value elsewhere in the opinion. *See Alcatraz Media Inc. v. Chesapeake Marine Tours Inc.*, 107 USPQ2d 1750, 1755 (TTAB 2013),

---

[2] Answer at 4, 4 TTABVUE 5.

[3] Due to the opinion's length and factual complexity, a summary timeline is appended.

*aff'd mem.*, 565 Fed. Appx. 900 (Fed. Cir. 2014); *Kohler Co. v. Baldwin Hardware Corp.*, 82 USPQ2d 1100, 1104 (TTAB 2007). Applicant's objections and motion to strike are denied.

## II. Record

The record in this case consists of the pleadings and, without any action by the parties, the file of the involved application. Trademark Rule 2.122(b)(1), 37 C.F.R. § 2.122(b)(1). Also of record are the discovery depositions, with exhibits, of the three witnesses designated to testify on behalf of the parties pursuant to FED. R. CIV. P. 30(b)(6): David Bakare, president of Opposer Executive Coach Builders, Inc.; Sean Myers, owner of Applicant SPV Coach Company, Inc.; and Richard Lester, Applicant's vice president.[4]

### A. Opposer's Evidence

Opposer made of record the testimonial deposition transcripts, with exhibits (some filed under seal), of the following witnesses:

- David Bakare, Opposer's president;[5]
- Samuel T. Rutherford, an independent contractor for Opposer since 2000;[6] and
- Thomas Zachary, general manager of Executive Coach East, the East Coast factory-owned dealership for Opposer.[7]

---

[4] Opposer's Notice of Reliance, Exhibits 19-21, 39-41 TTABVUE. The parties stipulated to admission of these discovery deposition transcripts, 38 TTABVUE, but they also may be offered in evidence by an adverse party pursuant to Trademark Rule 2.120(k)(1), 37 C.F.R. § 2.120(k)(1).

[5] 50-51 TTABVUE.

[6] 42-43 TTABVUE.

[7] 45-46 TTABVUE.

In addition, Opposer submitted the following documents by notice of reliance:

- Internet printouts and copies of magazine articles,[8] and
- Applicant's responses to Opposer's interrogatories and requests for production.[9]

B.     Applicant's Evidence

Applicant submitted testimonial deposition transcripts, with exhibits, of the following witnesses:

- Jerry Dutcher, a sales advisor for Opposer from 2005 to 2013;[10]
- Galen Floyd, who worked for Opposer in sales from 2005 to 2008, for a third-party limousine manufacturer from 1986 to 2003, and for a national parts distributor primarily for the limousine manufacturing industry from 2010 to 2013;[11]
- Edward E. Price, who has worked in specialty vehicle financing since 1983.[12] Mr. Price defined "specialty vehicles" as "ambulances, funeral cars, shuttle buses, limousines, tire truck/tow truck. Those type of vehicles."[13]
- James Robert Trotter, who has worked in specialty vehicle finance since 1989;[14]

---

[8] Exhibits 24-46, 39 TTABVUE 437-551, 55 TTABVUE.

[9] Opposer's Notice of Reliance, Exhibits 22 and 23, 39 TTABVUE 411-36. With respect to Opposer's requests for production, only Applicant's responses indicating that no responsive documents exist are properly of record. *See* Trademark Rule 2.120(k)(3), 37 C.F.R. § 2.120(k)(3); *United Global Media Grp., Inc. v. Tseng*, 112 USPQ2d 1039, 1044 (TTAB 2014). But, because both parties introduced responses to document requests by notice alone and neither party objected, we will treat the responses as being stipulated into the record. *See Hunter Indus., Inc. v. Toro Co.*, 110 USPQ2d 1651, 1657 n.13 (TTAB 2014); *Maids to Order of Ohio Inc. v. Maid-to-Order Inc.*, 78 USPQ2d 1899, 1901-02 (TTAB 2006).

[10] 56 TTABVUE.

[11] 58 TTABVUE.

[12] 60 TTABVUE.

[13] Price Test. at 4:23-5:4, 60 TTABVUE 9-10.

[14] 62 TTABVUE.

- Raymond T. Bush, program manager for the Cadillac Professional Vehicle Program at General Motors;[15]

- Jay Matthew Lankford, president of Heritage Coach Company, which sells hearses and limousines to the funeral industry;[16]

- James Mark Lankford, Jay Lankford's father, who started Heritage Coach in 1980 and is its owner and CEO;[17]

- Richard Lester, Applicant's vice president;[18] and

- Sean Myers, Applicant's owner.[19]

Applicant also submitted the following evidence by notice of reliance:

- Opposer's responses to Applicant's interrogatories and requests for production;[20]

- Book excerpts, Internet printouts, newspaper and magazine articles;[21]

- A copy of U.S. Patent No. 4014585 for converting a four-passenger sedan to a six-door limousine, which was issued in 1977 and assigned to Armbruster/Stageway, Inc.;[22] and

- Copies of printouts from the U.S. Patent and Trademark Office (PTO) Trademark Status & Document Retrieval electronic database (TSDR) for three trademark registrations owned by Opposer (Nos. 3170722, 3132275, and 3456238), and application Serial No. 73804085 for the mark ARMBRUSTER/STAGEWAY for "vehicles, namely, customized limousines" in International Class 12, which was filed on June 2, 1989 by Executive Coachbuilders, L.P. and abandoned on February 16, 1990, for failure to respond or late response to an Office action.[23]

---

[15] 64 and 66 TTABVUE.

[16] 68 TTABVUE.

[17] 70 TTABVUE.

[18] 72 TTABVUE.

[19] 74 TTABVUE.

[20] Exhibits A-C, 54 TTABVUE 12-69.

[21] Exhibits D-BB, 54 TTABVUE 70-313.

[22] Exhibit CC, 54 TTABVUE 314-19.

[23] Exhibits DD-GG, 54 TTABVUE 320-34.

III.    Background

This case revolves around the limousine business, in which both parties have been engaged for decades, although the mark at issue has even deeper roots. In 1887, Armbruster & Company of Fort Smith, Arkansas started building stagecoaches with vaults hidden in the floor to deter highway robbers.[24] The company began manufacturing stretch limousines in the 1920s and, in 1966, merged with Stageway Coaches to form Armbruster/Stageway, Inc.[25]

The Armbruster/Stageway business changed hands several times during the 1980s. It was acquired by NEOAX, Inc. in 1985[26] and sold again a few years later to M.J. Rosenthal & Associates and Merrill Lynch Interfunding, which also owned rival limousine maker Executive Coach Builders of Springfield, Missouri.[27] After that sale in the late 1980s, production of Armbruster/Stageway vehicles moved to Missouri and the Arkansas manufacturing plants where they had been built were sold to another competitor, Federal Coach, which retained many of the same employees.[28]

---

[24] Jeffrey A. Leib, *The Boom in Stretch Limousines*, N.Y. TIMES, Nov. 15, 1985 (Applicant's Notice of Reliance, Exhibit Y, 54 TTABVUE 288-91); LCT Staff, *Armbruster/Stageway: Almost a Century in Business*, LCT MAGAZINE, April 1, 1983 (Exhibit 18 to Price Test., 60 TTABVUE 139-40). The articles cited for Opposer's corporate history all are at least 20 years old. *See* FED. R. EVID. 803(16).

[25] *See id.*; *see also* LCT Staff, *Armbruster/Stageway: 100 Years of Building Specialty Vehicles*, LCT MAGAZINE, July 1, 1987 (Applicant's Notice of Reliance, Exhibit X, 54 TTABVUE 283-85) ("*100 Years*").

[26] *100 Years* (Applicant's Notice of Reliance, Exhibit X, 54 TTABVUE 285).

[27] *Armbruster Joins Executive Coach*, LCT MAGAZINE, May 1, 1989 (Opposer's Notice of Reliance, Exhibit 24, 39 TTABVUE 437-41). The heading on the Internet printout of this article indicates that "LCT" stands for "Limousine, Charter & Tour."

[28] *Id.*; *see also* Myers Trial Test. at 15:3-12, 74 TTABVUE 20 ("It [Armbruster Stageway] was sold to a company in Springfield, Missouri in the late '80s and essentially all the personnel stayed put and the company and the name was sold. But none of the employees at the time

On June 2, 1989, Executive Coachbuilders, L.P. filed the application to register ARMBRUSTER/STAGEWAY mentioned *supra*, which was abandoned the following year.[29] In 1990, both Executive Coach Builders and Armbruster/Stageway were acquired by R. J. Farris Associates, Inc., "which plan[ned] to continue building and marketing Executive and Armbruster/Stageway limousines as competing products."[30] R. J. Farris registered ARMBRUSTER/STAGEWAYS (plural) with the state of Missouri that year as a fictitious name, a registration that expired in 2009.[31]

In 1993, Opposer's current owner and president, David Bakare, purchased the assets of the company that had done business as Executive Coach Builders, which included the ARMBRUSTER/STAGEWAY mark.[32] Mr. Bakare testified that he became involved with the limousine business after graduating from the University of Southern California the same year:

---

wanted to relocate to Springfield so they all stayed in Fort Smith and that whole group became the employee base for what became Federal Coach."); Scott Fletcher, *The Faces of 1989*, LCT MAGAZINE, Jan. 1, 1990 (Applicant's Notice of Reliance, Exhibit W, 54 TTABVUE 274, 280).

[29] Applicant's Notice of Reliance, Exhibit GG, 54 TTABVUE 332-34. The record does not establish why "Coachbuilders" appears as one word in the application, but for our purposes it is sufficient that we assume that Executive Coachbuilders, L.P. and Executive Coach Builders were either related or the same entity.

[30] Scott Fletcher, *The Year in Review*, LCT MAGAZINE, Jan. 1, 1991 (Opposer's Notice of Reliance, Exhibit 34, 39 TTABVUE 507, 510); *see also* Bakare Discovery Test. at 54:12-18, 50 TTABVUE 56.

[31] Exhibit 11 to Bakare Trial Test., 50 TTABVUE 462-65.

[32] Bakare Trial Test. at 9:12-18, 50 TTABVUE 11. The record concerning the purchase, identified at n.47 *infra*, is deficient in some respects. However, Applicant conceded at oral hearing that whether Opposer obtained common-law rights in the relevant marks through the purchase is not outcome-determinative, and we do not focus on unanswered questions regarding their conveyance.

> My dad actually came to visit me when I was in college and – he's a big fan of limousines . . . – he has about four limousines – and we saw one driving down the street, and he inquired where do we get one of those.
>
> So, long story short, we went to [a] dealership, bought two executive limousines. And when he got back home, he called me and said, That's the best limousine I ever had. I was trying to get out of college at that point in time and was looking for a car dealership to . . . – for my family of car dealerships. We have the largest car dealerships in Nigeria. And he called me and that's when he told me, Hey, why don't you look for a car dealership.
>
> So we called the guy that sold us the limousine. And I said, Hey, you know the company that we love so much that built you that limousine, they're looking for a partnership. And we went in there, acquired the company, and that's all she wrote.[33]

Opposer grew to be the largest seller of limousines in the world.[34]

Applicant SPV Coach Company, Inc. was formed in 2007 by Sean Myers, its sole shareholder.[35] Myers has been involved in the limousine industry since 1991, when he left college and joined Applicant's related company, Southwest Professional Vehicles (SPV).[36] When Myers joined SPV, it was one of the largest distributors of Armbruster/Stageway cars.[37] In 2005, Sean Myers bought SPV from his father, Carl W. "Bill" Myers, and Richard Lester; it is now the largest distributor of funeral limousines and coaches, more commonly known as hearses, in the United States.[38]

---

[33] *Id.* at 6:21-7:16, 50 TTABVUE 8-9.

[34] Rutherford Test. at 93:19-22, 42 TTABVUE 95.

[35] Myers Discovery Test. at 14:4-19, 39 TTABVUE 26.

[36] Myers Trial Test. at 6:9-14, 74 TTABVUE 11.

[37] *See* Myers Discovery Test. at 141:16-19, 39 TTABVUE 153; Lester Trial Test. at 20:18-21:16, 72 TTABVUE 25-26.

[38] Myers Discovery Test. at 10:10-14:3, 39 TTABVUE 22-26.

Lester, Applicant's vice president, has worked for SPV (and its predecessor, Superior Southwest) since 1982.[39] He left the company for about a year in 1989-90, when he worked instead for Opposer's predecessor selling Armbruster/Stageway limousines.[40] For the past 25 years, Lester has been living in Georgia and working for Crain Sales, a distributor of new and used hearses and limousines catering to the funeral industry, which SPV acquired in 1988.[41] In addition to his role as Applicant's vice president, Lester is the vice president and general manager of Crain Sales.[42]

From 2008 to 2012, Applicant built its own funeral limousines and hearses under the mark SPV COACH COMPANY in its distribution and repair facility in Kansas.[43] However, after Federal Coach Company left the former Armbruster/Stageway plants in Arkansas and moved to Ohio in 2010, Applicant decided to move its production to the Fort Smith, Arkansas area, where it employed some of the same workers who had made Armbruster/Stageway cars in the past.[44] After Lester searched PTO records and saw that the ARMBRUSTER/STAGEWAY application had been abandoned in 1990, he and Myers decided to adopt the mark and rebrand Applicant's specialty vehicles ARMBRUSTER STAGEWAY.[45]

---

[39] Lester Trial Test. at 6:11-9:25, 72 TTABVUE 11-14.

[40] *Id.* at 22:6-17, 72 TTABVUE 27.

[41] *Id.* at 15:19-16:25, 72 TTABVUE 20-21.

[42] Lester Discovery Test. at 13:9-23, 39 TTABVUE 318.

[43] Myers Discovery Test. at 114:20-115:8, 39 TTABVUE 126-27.

[44] *Id.* at 39:6-24, 53:23-55:1, 39 TTABVUE 51, 65-67; Lester Discovery Test. at 19:17-22:7, 39 TTABVUE 324-27; Lester Trial Test. at 55:4-56:23, 72 TTABVUE 60-61.

[45] Lester Trial Test. at 112:9-113:4, 72 TTABVUE 117-18; Lester Discovery Test. at 46:21-47:2, 39 TTABVUE 351-52; Myers Trial Test. at 25:4-31:24, 39:6-24, 74 TTABVUE 30-36, 51.

Applicant began offering funeral cars under the ARMBRUSTER STAGEWAY mark in May 2013 and had sold approximately 495 of them through the end of 2015.[46]

To sum up this history, Applicant seeks to register a mark that differs from that which Opposer and its predecessors claim to have used only by the use of a space between the two identical words, rather than the forward slash that Opposer and its predecessor employed.

## IV. Opposer's Standing

Standing is a threshold issue that must be proven by the plaintiff in every *inter partes* case. Any person who believes it is or will be damaged by registration of a mark has standing to file an opposition. Trademark Act Section 13, 15 U.S.C. § 1063. Our primary reviewing court has enunciated a liberal threshold for determining standing, namely that a plaintiff must demonstrate that it possesses a "real interest" in a proceeding beyond that of a mere intermeddler, and "a reasonable basis for his belief of damage." *Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014) (quotation omitted), *cert. denied*, 135 S. Ct. 1401 (2015). A "real interest" is a "direct and personal stake" in the outcome of the proceeding. *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023, 1026 (Fed. Cir. 1999). A claim of likelihood of confusion that "is not wholly without merit," including prior use of a confusingly similar mark, may be sufficient "to establish a reasonable basis for a belief that one is damaged." *Lipton Indus., Inc. v. Ralston Purina Co.,* 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982).

---

[46] Myers Trial Test. at 33:12-34:2, 74 TTABVUE 38-39.

Neither party addressed Opposer's standing to bring this proceeding. Nonetheless, there is record evidence that Opposer acquired the goodwill of the Armbruster/Stageway trade name and "any trademarks associated with said trade names" as part of its purchase of the corporate assets of the company that had done business as Executive Coach Builders in December 1993.[47] As noted, ARMBRUSTER/ STAGEWAY is identical to the applied-for mark ARMBRUSTER STAGEWAY, except for the slash. Such punctuation does not distinguish the marks. *Cf., e.g., Mag Instrument Inc. v. Brinkmann Corp.*, 96 USPQ2d 1701, 1712 (TTAB 2010) (finding that hyphen does not distinguish MAG-NUM from MAGNUM), *aff'd mem.*, --- Fed. Appx. ----, 2011 WL 5400095 (Fed. Cir. Nov. 9, 2011).

The evidence supports a finding that Opposer has a "real interest" in this proceeding, and that its claim of priority and likelihood of confusion "is not wholly without merit." We find Opposer has established its standing.

## V.   Priority

Trademark Act Section 2(d) permits opposition on the basis of ownership of "a mark or trade name previously used in the United States . . . and not abandoned."

---

[47] *See* Opposer's Exhibit 21, Part 7 of 14, "Corporate Asset Purchase Agreement," 40 TTABVUE 16-17; *id.*, Part 9 of 14, "Corporate Asset Purchase Agreement Schedule 'C' – List of Trade Names," 40 TTABVUE 170; *id.*, "Shareholder Asset Purchase Agreement," 40 TTABVUE 204; *id.*, Part 10 of 14, "Schedule 'B' List of Trade Names" and "Shareholder Asset Purchase Agreement Schedule 'B' – Intellectual Property," 40 TTABVUE 242-43; *id.*, "Assignment and Bill of Sale," 40 TTABVUE 256-57; "Schedule 'B' List of Trade Names," 40 TTABVUE 288; "Assignment and Bill of Sale," 40 TTABVUE 298-99 (referencing "certain trade names and trademarks, including, but not limited to, 'Executive Coach Builders' and 'Armbruster/Stageway'"); *id.*, Part 13 of 14, "Schedule 'C' List of Trade Names," 40 TTABVUE 433. (The same documents also were exhibits to Mr. Bakare's testimony deposition and are filed at confidential 51 TTABVUE.) All of the documents are designated trade secret/commercially sensitive and filed under seal, but Opposer discussed the conveyance of the mark in its brief. *See* Opposer's Brief at 5, 16, 89 TTABVUE 6, 17.

We first consider whether Opposer has established its priority of use, a necessary element of any claim under Section 2(d).

Opposer must establish proprietary rights in its pleaded common-law mark that precede Applicant's actual or constructive use of its involved mark. *See Otto Roth & Co. v. Universal Foods Corp.*, 640 F.2d 1317, 209 USPQ 40, 43 (CCPA 1981); *Larami Corp. v. Talk to Me Programs Inc.,* 36 USPQ2d 1840, 1845 (TTAB 1995). In other words, because unregistered marks are not entitled to the presumptions established under Trademark Act Section 7(b)-(c), it is Opposer's burden to demonstrate that it owns a trademark that was used prior to Applicant's first use or constructive use of its mark and not abandoned. *Life Zone Inc. v. Middleman Grp. Inc.*, 87 USPQ2d 1953, 1959 (TTAB 2008).

Applicant's constructive use priority date is December 4, 2012, the date it filed its intent-to-use application to register ARMBRUSTER STAGEWAY pursuant to Trademark Act Section 1(b).[48] *See Syngenta Crop Prot. Inc. v. Bio-Chek LLC*, 90 USPQ2d 1112, 1119 (TTAB 2009); *Media Online Inc. v. El Clasificado Inc.*, 88 USPQ2d 1285, 1288 (TTAB 2008). Opposer argues that it has used the ARMBRUSTER/STAGEWAY mark at common law since it acquired that mark in

---

[48] Applicant argues that it made use analogous to trademark use of the ARMBRUSTER STAGEWAY mark by taking vehicle orders in Fall 2012, but we do not find the record evidence sufficiently definite to establish a specific earlier priority date. *See* Lester Trial Test. at 50:16-23, 72 TTABVUE 55 ("Q. Do you recall when you started taking orders for these vehicles? A. In 2012. Q. Do you have a month roughly? A. Goodness gracious. You know, probably September. Q. September of 2012? A. October, yeah. Absolutely."); Myers Trial Test. at 27:10-21, 74 TTABVUE 32 ("Q. Do you recall when you started taking orders for the Armbruster Stageway cars? A. We did. We already had several orders in 2012 before we built the car."). Nor is there any testimony or documentary evidence establishing that any orders placed before Applicant's filing date were sufficient to create an association in the minds of the purchasing public between the mark and the goods.

1993. Applicant, however, contends that, even assuming Opposer acquired proprietary rights in 1993, Opposer abandoned the mark and did not resume use before Applicant's priority date. An abandoned mark returns to the public domain. *See, e.g.*, *George & Co. v. Imagination Entm't Ltd.*, 575 F.3d 383, 91 USPQ2d 1786, 1796 (4th Cir. 2009) (stating that once abandoned, "a mark returns to the public domain and may, in principle, be appropriated for use by others in the marketplace . . . in accordance with the basic rules of trademark priority") (citation omitted); *Nobelle.com LLC v. Qwest Commc'ns Int'l Inc.*, 66 USPQ2d 1300, 1304 (TTAB 2003) (noting that a term that has been abandoned due to its loss of significance as a mark is in the public domain). We therefore must address the abandonment defense to determine which party has priority.

## VI. Applicant's Affirmative Defense of Abandonment

Section 45 of the Trademark Act, 15 U.S.C. § 1127, provides in relevant part that a mark shall be deemed to be "abandoned":

> When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

There are two elements to a nonuse abandonment claim: nonuse of the mark and intent not to resume use. *Noble House Home Furnishings, LLC v. Floorco Enters., LLC*, 118 USPQ2d 1413, 1417 (TTAB 2016); *see also Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*, 797 F.3d 1363, 116 USPQ2d 1129, 1131 (Fed. Cir. 2015), *cert. denied*, 136 S. Ct. 982 (2016). Introduction

of evidence of nonuse of a mark for three consecutive years constitutes a prima facie showing of abandonment and triggers a rebuttable presumption that a mark was abandoned without intent to resume use. *Rivard v. Linville*, 133 F.3d 1446, 45 USPQ2d 1374, 1376 (Fed. Cir. 1998). The presumption shifts the burden to the party contesting the abandonment to produce evidence of either (1) use of the mark during the statutory period, or (2) an intent to resume use. *Id.* The burden of persuasion, however, always remains with the party asserting abandonment to prove it, by a preponderance of evidence. *See Cerveceria Centroamericana S.A. v. Cerveceria India Inc.*, 892 F.2d 1021, 13 USPQ2d 1307, 1309 (Fed. Cir. 1989); *see also West Florida Seafood Inc. v. Jet Rests. Inc.*, 31 F.3d 1122, 31 USPQ2d 1660, 1666 (Fed. Cir. 1994) (stating that a party asserting abandonment as a defense to a prior use assertion "bears at a minimum a burden of coming forth with some evidence of abandonment").

A.     Opposer's Use of the ARMBRUSTER/STAGEWAY Mark

When considering the evidence of Opposer's use of ARMBRUSTER/STAGEWAY, we bear in mind that Section 45 of the Trademark Act further states that:

> The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce—
>
> (1) on goods when—
>
>> (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and
>>
>> (B) the goods are sold or transported in commerce, and

(2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

We first assess, in detail, the evidence of use of the mark by Opposer on vehicles; we will address other uses asserted by Opposer *infra*.

1.      Use of the ARMBRUSTER/STAGEWAY Mark on Cars

Opposer's president, David Bakare, testified that Opposer's mark was presented on the exterior of its finished cars with a badge, emblem, or sticker, for example, on the rear quarter panel or back fender.[49]

Mr. Bakare testified during his discovery deposition in August 2014 that Opposer was still manufacturing ARMBRUSTER/STAGEWAY vehicles when he bought the company's assets in December 1993.[50] Funeral cars were manufactured under the Armbruster name then, while Executive Coach manufactured limousines.[51] During the discovery deposition, Mr. Bakare first testified that "there's no way I can remember" how many cars with the ARMBRUSTER/STAGEWAY brand Opposer manufactured from 1993 to 1998,[52] then testified that about 20 percent of cars during

---

[49] *See, e.g.*, Bakare Trial Test. at 122:19-123:5, 50 TTABVUE 124-25; *see also* Rutherford Test. at 20:3-7, 42 TTABVUE 22.

[50] Bakare Discovery Test. at 32:2-33:19, 41 TTABVUE 34-35.

[51] *Id.* at 33:1-7, 41 TTABVUE 35; *see also id.* at 38:2-5, 41 TTABVUE 40 (stating that "when I took it over, we mainly used it for Cadillacs, because we mainly used Armbruster in the funeral industry, and the funeral industry was very, very strong on Cadillacs").

[52] *Id.* at 38:6-9, 41 TTABVUE 40.

those years were marked with an ARMBRUSTER/STAGEWAY badge.[53] The company made about 40 cars per year during that time,[54] which would mean that Opposer produced approximately eight cars with the ARMBRUSTER/STAGEWAY mark per year from late 1993 to 1998 (yielding a five-year total of 40 cars). Opposer's overall production greatly expanded in 1998, but by then, it was making "very few" ARMBRUSTER/STAGEWAY cars.[55]

From 2004 to 2009, Mr. Bakare testified during his discovery deposition, Opposer produced 20 to 30 cars total with an ARMBRUSTER/STAGEWAY badge, but he also testified during that deposition that production was "1 or 2" or "a few" in the 10 years preceding the deposition (2004-2014) and probably none in the last five years (2009-2014).[56] Opposer had a stock of ARMBRUSTER/STAGEWAY badges that it used up over the years after he bought the company, Mr. Bakare testified: "So the reason why I know – I'm saying that we kind of did a few here and there was because I was told we kind of just r[a]n out."[57]

Also during his discovery deposition, Mr. Bakare testified that there are no business records tallying use of the ARMBRUSTER/STAGEWAY mark on cars.[58] Opposer sold "about 20 units over a period of time where we did have the – the

---

[53] *Id.* at 41:12-42:5, 41 TTABVUE 43-44.

[54] *Id.* at 36:8-37:2, 41 TTABVUE 38-39.

[55] *Id.* at 43:1-22, 41 TTABVUE 45.

[56] *Id.* at 59:5-65:16, 41 TTABVUE 61-67.

[57] *Id.* at 63:6-22, 41 TTABVUE 65 (testifying in part that, in 2011, "when I went to parts to pick up the – the badge, I was told that we just recently ran out of – of those").

[58] *Id.* at 64:25-65:17, 41 TTABVUE 66-67.

stickers on the vehicle, but I don't – I don't recall – I mean record which vehicle gets what."[59] Mr. Bakare testified that there are no invoices, pictures, or customer or sales records identifying what cars Opposer sold bearing the ARMBRUSTER/STAGEWAY mark.[60] He explained that, "even in 1993, when we're selling those Armbruster with the badge on them, we issued invoices under Executive Coach Builders because we had one account, one corporate name, and that's how we collected checks."[61]

During his testimony deposition in March 2016, Mr. Bakare reaffirmed his discovery testimony.[62] However, he indicated on cross-examination during his trial testimony that his earlier estimate that eight cars per year were produced with the ARMBRUSTER/STAGEWAY mark from 1993 to 1998 was uncertain:

> Q. Okay. And so you don't know the breakdown of what the cars were, you don't know what the models were, you don't know who the customers were, you don't know what industry they were for. You just know roughly that you produced forty cars per year and about twenty percent, or eight cars, were branded Armbruster/Stageway?
>
> A. Okay, you guys take my twenty percent guess number and make it sound like, okay, that is it.
>
> Q. Okay. So it could be two –
>
> A. No.

---

[59] *Id.* at 139:20-140:18, 41 TTABVUE 141-42.

[60] *See id.* at 41:4-8, 64:25-65:8, 70:10-71:2, 41 TTABVUE 43, 66-67, 72-73.

[61] *Id.* at 73:6-23, 41 TTABVUE 75; *see also id.* at 65:17-21, 41 TTABVUE 67 ("Q. Are there any documents that [Opposer] maintains that would show you which customers or which vehicles were branded Armbruster/Stageway? A. It wouldn't be on the work order, so it won't be – no. No. Nothing that I can think of."); Bakare Trial Test. at 152:17-20, 50 TTABVUE 154.

[62] Bakare Trial Test. at 111:5-112:19, 50 TTABVUE 113-14.

Q.     – it could be ten?

A.     It could be many more. Many more than twenty percent. It could be more.[63]

And later:

Q.     . . . [Y]ou testified earlier from '93 to '97 you probably made about eight cars that you branded Armbruster/Stageway by putting the sticker on the back; is that right?

A.     I – that was just a guess.

Q.     Right.

A.     It was a minimum of eight cars. It could be more.

Q.     Could be more, could be less?

A.     No, it couldn't be less.

Q.     Why not?

A.     Because at that point in time I was still filling the customers of both Armbruster and ECB [Executive Coach Builders]. I was just getting into the business, so I was just kind of following what was already on the ground.[64]

Mr. Bakare testified that Opposer produced cars marked ARMBRUSTER/ STAGEWAY "sporadically" from the early 1990s until "around 2011";[65] indicated Opposer branded no cars ARMBRUSTER/STAGEWAY from 2009 on;[66] and said

---

[63] *Id.* at 149:3-16, 50 TTABVUE 151.

[64] *Id.* at 249:3-17, 50 TTABVUE 251.

[65] *Id.* at 39:25-43:1, 50 TTABVUE 41-45.

[66] *See id.* at 83:11-84:3, 50 TTABVUE 85-86; *see also* Reply Brief at 23, 93 TTABVUE 24 (stating that Opposer used the mark "on vehicles themselves as late as 2008 or 2009").

Opposer retained some ARMBRUSTER/STAGEWAY emblems even at the time of his

testimony, although none was produced or entered into evidence.[67] He testified:

> Q. Sitting here today, when do you believe the last time was that Executive Coach Builders manufactured a specialty vehicle on which it attached . . . an Armbruster/Stageway badge?
>
> A. That's – that's – I want to say we – I know definitely in the early '90s, then there was a process where we skipped for a while. Then we had badges when we – in 2009, 2010, that we were going to use, and I want to say that last one was – was probably around – around 2011, was – because we used up all those badges. And the only time we used them – well, it's a fact. The only time we used them was when we put them on cars. Now, we put them on cars, you know, just randomly.[68]
>
> * * *
>
> Q. Is it – would it be a true statement that in the early 1990s, that there were specialty vehicles being manufactured from a Lincoln upon which you placed an Armbruster/Stageway . . . badge?
>
> A. Yes.
>
> Q. And how long did your company, Executive Coach and Armbruster/Stageway, continue to manufacture specialty vehicles upon which you placed an Armbruster/Stageway badge?
>
> A. I mean, sporadically through – through the years. And generally you have a customer that – obviously it's something we don't document, we say, Okay, we put Armbruster/Stageway on this one, because we really don't – you don't envision a situation like this where, you know, you have to defend your name being hijacked. So we don't document it.

---

[67] Bakare Trial Test. at 140:20-141:8, 221:5-20, 50 TTABVUE 142-43, 223.

[68] *Id.* at 39:25-40:15, 50 TTABVUE 41-42.

However, we sporadically put it on over the period of time between – when we bought the company there were nametags that came with it. We had a bunch of them. Obviously over the years we've kind of used them up. And if you have someone that's more of a fan, or whatever have you, of Armbruster, or whatever have you, we put it on. But we generally try to reserve those for our reentry into the market, our reentry into the market. So we kind of used those sporadically, so to speak.[69]

Later, on cross-exam, Mr. Bakare testified that the ARMBRUSTER/STAGEWAY brand was used on cars at the company's initiative, not by customer request:

Q.      . . . So from 1998 to 2009, you think that you put the Armbruster/Stageway emblem on the exterior of a car twenty to thirty times upon customer request; is that—

A.      Not so much upon customer request. We told them, if we know where it's going, then if we know it's a funeral car, we put them on.

Q.      Okay.

A.      And we put them sporadically.

Q.      Okay.

A.      And one of the reasons why I say that, in 2011 we probably used up the last few ones. Because in 2009 we had a few left, and I didn't want to put them on just 2010. We didn't want to put them on those cars because I didn't have enough.

Q.      Okay. But you don't really know when you used them up?

---

[69] *Id.* at 41:19-43:1, 50 TTABVUE 43-45; *see also* Bakare Discovery Test. at 63:23-64:12, 41 TTABVUE 65-66 (testifying that the brand was used on limousines: "As customer[s] request, or if we build – if we think we're doing something to a funeral company or whatever have you or one of the old-time customers, you know, we'll – we'll put it on.").

> A.     I know we used them up around 2011 because towards that time, all of a sudden we didn't have any more because we had used them up.[70]

Mr. Bakare testified that Opposer developed a new six-door Cadillac limousine (commonly used in the funeral industry[71]), manufactured eight to ten of them in 2009 or 2010 for a company named B & S Funeral Limousine ("B & S Limo") and intended to place an ARMBRUSTER/STAGEWAY badge on them, but decided to put its plans on hold when it found out that Cadillac was going to change the body style, "[b]ecause we said there's no point in launching with a car that we know it's going to be obsolete in less than a year":[72]

> That was actually the intent, but we just didn't have enough badges, and I didn't want to have to place it on some of them and not all of them. So, that's why – that's when we said, Okay, we just – and at that point in time, also, I think was when we also figured out there's a new body style anyway.
>
> So everything was pointing on just saying, Okay, we just do it when we do the relaunch. Because at that point in time we figured out that since the new body style was coming out, we might just go ahead and push forward our relaunch anyway. So we didn't put it on those vehicles because we didn't have enough, we didn't have enough to.[73]

---

[70] *Id*. at 254:8-255:2, 50 TTABVUE 256-57.

[71] *See, e.g.*, Rutherford Test. at 48:10-13, 42 TTABVUE 50 ("Q. [W]as it your testimony that the six-door funeral car is the standard vehicle for the funeral industry? A. Yes."); 49:1-9, 42 TTABVUE 51 ("Even to this day, Cadillac still dominates the market," constituting 85 to 90 percent of funeral cars).

[72] Bakare Trial Test. at 62:23-64:18, 50 TTABVUE 64-66. Jay Lankford testified that B & S Limo is affiliated with Brown & Son Funeral Home in Belmont, Mass. Jay Lankford Test. at 50:11-51:1, 68 TTABVUE 55-56.

[73] *Id*. at 83:11-84:3, 50 TTABVUE 85-86; *see also id*. at 221:5-23, 50 TTABVUE 223 ("Q. . . . [G]oing back to this invoice with B & S Funeral Limousine, Incorporated, which is dated May 31st, 2010, this was when you realized that you ran out of the Armbruster/Stageway emblems? A. Yeah, that's with the order. That order was when I realized that we don't have

Later, Opposer intended to use the ARMBRUSTER/STAGEWAY mark on a Mercedes-Benz Sprinter family coach (a combination limousine/hearse), but by the time the vehicle was finished in late 2013,[74] Opposer could not use the mark because Applicant was already using it: "I wanted to so badly, because, again, it would have given us the immediate recognition and instant entry that we wanted, which is why we preserved the name for all these years."[75]

The oral testimony even of a single witness may be adequate to establish priority, but only if it is sufficiently probative. *See Powermatics, Inc. v. Glebe Roofing Prods. Co.*, 341 F.2d 127, 144 USPQ 430, 432 (CCPA 1965); *Kohler Co.*, 82 USPQ2d at 1108. Such testimony "should not be characterized by contradictions, inconsistencies, and indefiniteness but should carry with it conviction of its accuracy and applicability." *B.R. Baker Co. v. Lebow Bros.*, 150 F.2d 580, 66 USPQ 232, 236 (CCPA 1945); *Nationstar Mortg. LLC v. Ahmad*, 112 USPQ2d 1361, 1372 (TTAB 2014). Oral testimony is strengthened by corroborative documentary evidence. *Elder Mfg. Co. v.*

---

enough. Q. Okay. A. We had some, but we didn't have enough. We didn't run out. We just knew we didn't have enough. Q. So, so, the cars that were sold to B & S Funeral Limousines, Incorporated, were not branded Armbruster/Stageway? A. No, but the reason why was, I think they wanted eight cars and we didn't have enough to put on all of them. Q. Mm-hmm. A. So we just decided, Okay, we're going to relaunch anyway, so just wait till then.").

[74] Rutherford Test. at 29:20-30:20, 42 TTABVUE 31-32.

[75] Bakare Trial Test. at 92:17-93:7, 50 TTABVUE 94-95; *see also* Rutherford Test. at 28:8-34:21, 42 TTABVUE 30-36 ("Q. And were you able to mark this vehicle Armbruster Stageway as you desired to do? A. No, I was not. Q. Why not? A. Because at the time we were going to market it that way when it first was built, we discovered that there was somebody else with Armbruster Stageway, and that's when we discovered that Sean Myers and them had, you know, came out with a vehicle and put the Armbruster Stageway name on the vehicle. Q. So are you saying that around the time you manufactured this vehicle, the one you designed, you learned that someone else was using the mark Armbruster Stageway? A. Right. . . . ").

*Int'l Shoe Co.*, 194 F.2d 114, 92 USPQ 330, 333 (CCPA 1952). But here, the testimony is indefinite and internally inconsistent; unsupported by documentary evidence; and contradicted by the documentary evidence that is of record, as well as by the clear and consistent testimony of eight other trial witnesses.

We first consider the documentary evidence. The detailed agreement listing the inventory Opposer purchased in 1993 indicates that it included EXECUTIVE COACH emblems but zero ARMBRUSTER/STAGEWAY emblems.[76] When questioned about the inventory on cross-examination during his testimony deposition, Mr. Bakare said that Opposer must have reordered the emblems,[77] contradicting his previous testimony both on direct examination and during his discovery deposition that Opposer had acquired ARMBRUSTER/STAGEWAY emblems in its 1993 asset purchase and used them up on cars over time. There is no record evidence of any reorder.

The additional documentary and circumstantial evidence of record is inconsistent with use of the ARMBRUSTER/STAGEWAY mark on cars by Opposer. The only advertisement of record for the name, a listing for Armbruster/Stageway in the "World Telecommunication Database International Telex and Telefax Directories,"

---

[76] 51 TTABVUE 93 (confidential). Although the underlying document is filed under seal, the inventory is discussed in publicly available trial testimony. *See* Bakare Trial Test. at 140:20-141:8, 50 TTABVUE 142-43: "Q. And what's the quantity next to 'A/S emblem'? A. It says zero, but you know what, I got some in my drawers. Q. Well, that's interesting, but you didn't produce any in this proceeding, did you? A. No, no, no. I – okay."

[77] *See* Bakare Trial Test. at 141:21-148:9, 50 TTABVUE 143-50.

apparently ceased in 1996.[78] An undated marketing letter signed by Mr. Bakare, which he testified appeared to be a company profile from 1997, discusses Opposer's limousine business and then Armbruster Stageway Inc., stating: "Armbruster is the oldest and still the most recognized name in the Funeral industry."[79] The letter references "the reintroduction of Armbruster Stageway" and states, in pertinent part:

> For the past 3 years, Armbruster has not manufacture [sic] any funeral product but that is about to change. Due to the continuous customer demand for Armbruster products (the name and product they've known for over 100 yrs) and the booming funeral industry, Executive Coach Builders will be reintroducing the sleeping giant "Armbruster Stageway Inc." in the summer of 1997. . . .[80]

Mr. Bakare testified that it was untrue that Opposer had not manufactured any funeral products for the three years preceding 1997.[81]

Similarly, a September 2001 cover story in *Limousine Digest* magazine states that Opposer's planned

> new product line, funeral cars, is actually not new at all since Armbruster-Stageway falls under the Executive umbrella. A pioneer in the funeral business, Armbruster dates back to the 1880s. *Executive is still considering whether or not to bring back the Armbruster name for the new division.* (emphasis added).[82]

---

[78] Exhibit 30 to Bakare Discovery Test., 41 TTABVUE 565-66; Exhibit 12 to Bakare Trial Test., 50 TTABVUE 466-69. Mr. Bakare testified that the advertising expired in 1996. Bakare Discovery Test. at 204:15-205:17, 41 TTABVUE 206-07.

[79] Exhibit 19 to Bakare Discovery Test., 41 TTABVUE 469.

[80] *Id.*

[81] Bakare Discovery Test. at 120:19-124:14, 41 TTABVUE 122-26.

[82] Exhibit 20 to Bakare Discovery Test., 41 TTABVUE 470-72.

When questioned, Mr. Bakare testified that the article was referencing a business split and that Opposer was producing ARMBRUSTER/STAGEWAY branded funeral vehicles in 2001.[83]

Stories about Opposer's business in the April 2004 issue of *Limousine Digest* and the August 2005 issue of *LCT Limousine & Chauffeured Transportation* do not mention ARMBRUSTER/STAGEWAY at all.[84] Also, Opposer applied to register the marks EXECUTIVE COACH BUILDERS and  in 2005 and the mark in 2007, but never applied to register ARMBRUSTER/ STAGEWAY.[85] Mr. Bakare testified: "I don't know why Armbruster didn't come up, but, boy, did I wish it came up at that point in time, in that conversation."[86]

In sum, we find no documentary evidence of record supporting use of the ARMBRUSTER/STAGEWAY mark on cars by Opposer at any time.

The indefinite nature and internal inconsistencies of Mr. Bakare's testimony include at least the varying estimates of the number of ARMBRUSTER/STAGEWAY-branded vehicles produced by Opposer; Mr. Bakare's admitted guesswork regarding those numbers; the reason why the ARMBRUSTER/STAGEWAY mark was placed on cars by Opposer ("randomly" vs. at customer request vs. on any car Opposer knew would be used in the funeral industry); the source of the car emblems displaying the

---

[83] Bakare Discovery Test. at 125:2-128:4, 41 TTABVUE 127-30.

[84] *See* Exhibit 14 to Bakare Discovery Test., 41 TTABVUE 420-24 (printed from Opposer's website).

[85] Applicant's Notice of Reliance, Exhibits DD-FF, 54 TTABVUE 320-31.

[86] Bakare Trial Test. at 203:21-204:17, 50 TTABVUE 205-06.

mark (conveyed with the 1993 asset purchase or reordered); and whether and how those emblems were depleted in whole or in part between 2009 and 2011, given Mr. Bakare's testimony that Opposer variously had produced no ARMBRUSTER/ STAGEWAY-branded cars since 2009, ran out of the badges in 2011, but still had some at the time of trial.

In contrast, eight other trial witnesses gave clear, consistent testimony contradicting Mr. Bakare's recollection of use of the ARMBRUSTER/STAGEWAY mark on cars by Opposer. The table below summarizes the timeframe for which each witness testified that the mark was not used on cars by Opposer or its predecessors-in-interest; it excludes Applicant's use of the mark on cars beginning in 2013.

| Witness | Position | Testimony re When Witness Last Saw Mark Used on Cars by Opposer or Predecessors |
|---|---|---|
| Edward E. Price | Specialty vehicle finance since 1983 | 1989 or 1990 |
| Sean Myers | Applicant's president | 1990 |
| Richard Lester | Applicant's vice-president | 1990 |
| James Robert Trotter | Specialty vehicle finance since 1989 | Early 1990s |
| Thomas Zachary | General manager, Executive Coach East | Early 1990s |
| Jay Matthew Lankford | Heritage Coach, 1999-present | Never |
| Jerry Dutcher | Sales for Opposer, 2005-2013 | Never |
| Galen Floyd | Sales for Opposer (2005-08); other limousine industry jobs (1986-2003, 2010-13) | Never |

The relevant testimony of each of these witnesses is discussed below.

1. <u>Edward E. Price</u>. Mr. Price testified that he had been in professional vehicle car financing for 33 years,[87] attending about 12 funeral trade shows and conventions a year and seeing vehicles during weekly visits to funeral homes.[88] He has financed cars for Opposer and for all the major dealers in the funeral car industry.[89] Before Applicant's use, the last car he saw branded ARMBRUSTER/STAGEWAY was in 1989 or "[m]aybe as late as '90."[90] He has never seen a car branded ARMBRUSTER/ STAGEWAY produced by Opposer or a reference to such a car in a trade periodical.[91] Mr. Price testified that, to the best of his knowledge, none of Opposer's cars have been branded ARMBRUSTER or ARMBRUSTER STAGEWAY.[92]

2. <u>Sean Myers</u>. Mr. Myers, Applicant's owner, testified at trial that he began working for SPV full-time in 1991. He testified that he saw no new vehicles in the 1990s through mid-2000s that were branded ARMBRUSTER/STAGEWAY and had never seen a car with that brand produced by Opposer.[93] During his discovery deposition, Mr. Myers testified as follows:

---

[87] Price Test. at 23:9-26:19, 60 TTABVUE 28-31.

[88] *Id*. at 32:19-33:10, 60 TTABVUE 37-38.

[89] *Id*. at 35:19-36:14, 60 TTABVUE 40-41.

[90] *Id*. at 18:12-19:21, 60 TTABVUE 23-24; *see also id*. at 116:7-117:1, 60 TTABVUE 121-22.

[91] *Id*. at 35:2-18, 60 TTABVUE 40.

[92] *Id*. at 70:15-23, 60 TTABVUE 75; *see also id*. at 75:1-12, 60 TTABVUE 80 (testifying that "there weren't any" cars branded ARMBRUSTER/STAGEWAY for sale or trade from the early 1990s through the late 2000s), 99:15-100:5, 60 TTABVUE 104-05 ("Q. And it's your understanding and belief that Executive Coach Builders did not use the trademark Armbruster/Stageway or the brand Armbruster/Stageway on any vehicles after the late 1980s? A. Correct.").

[93] Myers Trial Test. at 20:19-23:9, 74 TTABVUE 25-28.

Q.    Okay. Prior to SPV Coach adopting and using the Armbruster-Stageway mark, did you or anyone else at SPV Coach contact anyone with Executive Coach Builders?

A.    No.

Q.    Why not?

A.    Because they weren't building any Armbruster-Stageway cars. They hadn't built anything that had Armbruster-Stageway on it since the '90s, like 1990.

Q.    How do you know that?

A.    Because this is my life. This is all I do. This is – if – we would have seen them come in on trades, we would have heard about them, we would have sold them, or we would have somehow run into them, but they don't exist.

Q.    Do Crain Sales and Southwest sell vehicles manufactured by Executive Coach?

A.    No.

Q.    So when you say – when you testified a minute ago that you knew that Executive Coach had not sold a vehicle utilizing the Armbruster-Stageway mark –

A.    Right.

Q.    – since 1990, you base that testimony upon your own personal knowledge.

A.    Of 25 years of being in this industry. They – they don't exist. There is not one.[94]

---

[94] Myers Discovery Test. at 103:5-104:7, 39 TTABVUE 115-16; *see also, e.g.*, *id.* at 108:2-10, 39 TTABVUE 120 ("We are active participants in this industry, and if anyone had been using the Armbruster-Stageway name in any capacity, we would have known about it. Just like Bakare found out when we were going to use the Armbruster-Stageway name, because this industry is very incestuous, and everybody talks, especially if there's something that you should hear about.").

3. <u>Richard Lester</u>. Mr. Lester, Applicant's vice-president, has worked for that company, its related companies, and predecessors since 1982, except for his time selling ARMBRUSTER/STAGEWAY vehicles for Opposer's predecessor from approximately 1989 to 1990. Mr. Lester testified that he sold some 20 ARMBRUSTER/STAGEWAY cars total before returning to Applicant's related company Southwest Professional Vehicles (SPV), which had been one of the biggest ARMBRUSTR/STAGEWAY distributors.[95]

After the 1989 transaction that united Armbruster/Stageway, Inc. and Executive Coach Builders under the same ownership, Mr. Lester testified:

> And what had happened is Armbruster more or less they shut it down. They had a backlog of business at the time, not a lot but a little bit, and then Armbruster, I would assume, sold it to Executive Coach Builders. And that was probably in late '89, I guess. I could be wrong about my dates but thereabouts. And so Armbruster Stageway in Fort Smith, Arkansas ceased to exist.
> The manufacturing of the cars that they had on order was completed in Springfield, Missouri. That's when I went over there and started working for them. And I don't really think that – they were initially going to sell the Armbrusters but that just died on the vine. About a year later, it was gone.[96]

Although both the Executive Coach and Armbruster/Stageway lines of cars were manufactured at the same production facility in Springfield, Missouri, the companies maintained separate offices and remained competitors during the time Mr. Lester worked for the Armbruster/Stageway division:

---

[95] Lester Trial Test. at 22:6-14, 113:5-15, 72 TTABVUE 27, 118.

[96] *Id.* at 19:2-16, 72 TTABVUE 24.

Q. And when you say they had separate salespeople, sales teams, is that consistent with your recollection?

A. They were physically separate. You did not intermingle with those people, that they were in a separate building.

Q. Because they were both making competitive cars?

A. The Executive people resented the Armbruster people. They were fierce competitors for years and years, and really that's – that's really why it – Armbruster died.[97]

Mr. Lester testified that he had purchased one or two ARMBRUSTER/ STAGEWAY cars for SPV in the early 1990s, but had not seen, purchased, or taken on trade an ARMBRUSTER/STAGEWAY car manufactured after 1991, nor seen a reference to nor advertisement for such a car:[98]

Q. Were there any documents created recounting or reflecting the process that you and Sean [Myers] went through in making the decision to adopt the mark Armbruster-Stageway for SPV Coach?

A. No, but I'm sure the Internet is the same now as it was back then. . . . I could not find anything where the name was used anywhere. You know, you – there are no Armbruster-Stageway vehicles that were manufactured since – I don't think anything since 1990.

---

[97] Lester Discovery Test. at 63:20-64:6, 39 TTABVUE 368-69; *see also id.* at 36:20-37:12, 39 TTABVUE 341-42.

[98] *See* Lester Trial Test. at 27:21-32:4, 100:1-9 and Exhibit 55 (1990 invoices and related documents), 72 TTABVUE 32-37, 105, 213-21; *see also* Exhibit 13 to Bakare Discovery Dep., 41 TTABVUE 291-96 (1990 order forms); Lester Discovery Test. at 69:4-8, 39 TTABVUE 374 ("Q. Did you ever seen an Executive – did you ever see a car after, say, 1993 – A. That was branded – Q. – that was branded Armbruster-Stageway? A. I never saw one after 1991."); *id.* at 71:16-19, 39 TTABVUE 376 ("Q. From 1993 to 2012, have you ever seen an entity put out a car that was branded Armbruster-Stageway? A. Of course not. Nobody has.").

> Q. Why do you believe that there were no Armbruster-Stageway vehicles manufactured since 1990?
>
> A. I don't believe it; I know it.
>
> Q. How do you know it?
>
> A. There just – there just aren't any out there. Show me one.[99]

4. <u>James Robert Trotter</u>. Mr. Trotter testified that he has been working in specialty vehicle finance for 27 years; he and Mr. Price began working together in 1989.[100] Mr. Trotter first encountered and financed ARMBRUSTER/STAGEWAY cars in the late 1980s: "They were still around until the early '90s, and, again, I am not sure of the dates and all of that, but at least for a few years, and then they went away."[101] Mr. Trotter testified that neither Opposer nor any third party used the ARMBRUSTER/STAGEWAY mark from the early 1990s through the late 2000s.[102]

5. <u>Thomas Zachary</u>. Mr. Zachary is general manager of Executive Coach East, the East Coast factory-owned dealership for Opposer, located in Cinnaminson, New Jersey, a job he has held since 2002.[103] Mr. Zachary testified that he has never sold a car branded ARMBRUSTER/STAGEWAY,[104] has not seen one at his dealership since he began work there in 2002,[105] has not seen one produced by Opposer at any trade

---

[99] Lester Discovery Test. at 44:6-23, 39 TTABVUE 349.

[100] Trotter Test. at 4:16-6:14, 62 TTABVUE 9-11.

[101] *Id.* at 7:14-9:19, 62 TTABVUE 12-14.

[102] *Id.* at 33:6-34:21, 62 TTABVUE 38-39.

[103] Zachary Test. at 5:25-7:21, 45 TTABVUE 7-9.

[104] *Id.* at 45:13-15, 45 TTABVUE 47.

[105] *Id.* at 53:4-7, 45 TTABVUE 55.

show,[106] and that Opposer has not built such cars since the early 1990s.[107] He also testified that he sees only a small percentage of the cars Opposer builds, and that it is possible Opposer might have manufactured a vehicle branded ARMBRUSTER/STAGEWAY during the past ten years without his knowledge.[108]

Mr. Zachary testified that he first registered the domain names <armbrusterstageway.com> and <armbrusterstagewaylimousines.com> in December 2009 after "a conversation that I had with the owner of Executive Coach Builders regarding the building of some funeral cars for a customer and to – and for us to, you know, relaunch the Armbruster/Stageway name."[109] Mr. Zachary continued:

> Q. Tell us more about that. What are you talking about?
>
> A. I had a customer that we were selling some funeral cars to, some six-door Cadillacs. And we – myself and David Bakare were discussing the deal and discussing the – this particular deal and making – you know, *bringing back the Armbruster/Stageway name and starting a funeral car line in association with that*. (emphasis added).
>
> * * *
>
> Q. Who was the purchaser of the six-door Cadillacs that you were discussing branding as Armbruster/Stageway?
>
> A. The name of the company was B&S Funeral Services or Funeral Livery Services.
>
> * * *

---

[106] *Id.* at 87:24-88:8, 45 TTABVUE 89-90.

[107] *Id.* at 49:3-6, 45 TTABVUE 51 ("Q. But Executive Coach Builders hasn't been building Armbruster/Stageway cars since the early '90s; isn't that correct? A. Yes.").

[108] *Id.* at 85:22-86:4, 45 TTABVUE 87-88.

[109] *Id.* at 14:21-15:3, 45 TTABVUE 16-17.

Q. Were the six [sic] limousines that were sold to B&S Limo, were they ultimately branded with the name Armbruster/Stageway?

A. No.

Q. Do you know why?

A. No.

Q. Who made the decision ultimately not to brand them Armbruster/Stageway?

A. Executive Coach Builders.

Q. Which would be David Bakare?

A. Yes.[110]

Mr. Zachary later testified that Mr. Bakare did not mention during that conversation that Opposer had produced cars under the ARMBRUSTER/STAGEWAY name.[111] The ten cars for B & S Limo were shipped through 2010 and possibly into 2011.[112]

6. Jay Matthew Lankford. Mr. Lankford has worked for Heritage Coach, a third-party competitor that sells hearses and limousines to the funeral industry, since 1999 and became its president in 2010.[113] Mr. Lankford has never seen or taken on trade

---

[110] *Id.* at 15:4-16:25, 45 TTABVUE 17-18; *see also id.* at 60:18-61:6, 45 TTABVUE 62-63 ("Q. And you believe that you started having discussions with Mr. Bakare about entering the funeral car industry in or around 2009? A. Correct. Q. And why 2009? A. Because we were – you know, I had a customer who I solicited to buy – a funeral car customer that wanted to buy some six-door Cadillacs. He actually bought ten of them all together and we thought that was a good time to bring the Armbruster name back since we were developing – doing R&D for him for these ten units and we were going to continue to build a line of funeral cars.").

[111] *Id.* at 87:18-23, 45 TTABVUE 89.

[112] *Id.* at 66:15-20, 45 TTABVUE 68.

[113] Jay Lankford Test. at 7:23-9:2, 68 TTABVUE 12-14.

a car branded ARMBRUSTER/STAGEWAY; before Applicant's use, he understood the brand to be defunct.[114]

7. <u>Jerry Dutcher</u>. Mr. Dutcher worked as a sales advisor for Opposer in Springfield, Missouri from 2005 to 2013.[115] He testified that, while he did not see every car manufactured by Opposer – in particular, he did not have personal knowledge concerning the branding of vehicles sold by other sales advisors – he saw no cars marked ARMBRUSTER/STAGEWAY while he worked there.[116] Referencing a sign at Opposer's facility discussed *infra*, Mr. Dutcher testified as follows:

> Q. When did you first hear the term "Armbruster" or "Armbruster-Stageway"?
>
> A. The sign up in – back there by the delivery department. I mean, there's a big sign. I never actually knew what it was and still really don't.
>
> Q. Uh-huh.
>
> A. I remember asking somebody what it was, and they said it was a company that David [Bakare] had purchased years ago or whenever he first bought the company, I guess.[117]

8. <u>Galen Floyd</u>. Mr. Floyd testified that he worked in sales for Opposer from 2005 to 2008; at a third-party limousine company and competitor of Opposer also located in Springfield, Missouri from 1986 to 2003; and at Infinite Innovations, a distributor

---

[114] *Id.* at 37:19-38:12, 64:23-65:2, 80:23-81:16, 68 TTABVUE 42-43, 69-70, 85-86.

[115] Dutcher Test. at 8:10-9:11, 56 TTABVUE 13-14.

[116] *Id.* at 39:2-19, 74:7-14, 88:3-11, 56 TTABVUE 44, 79, 93.

[117] *Id.* at 37:19-38:2, 56 TTABVUE 42-43.

that primarily sold parts to limousine makers, from 2010 to 2013.[118] He heard the name ARMBRUSTER/STAGEWAY in the late 1980s, but never saw it used in connection with cars before Applicant's use.[119] He was not aware of any use of ARMBRUSTER/STAGEWAY by Opposer during the years he worked there.[120]

None of these witnesses expressed uncertainty or doubt concerning their knowledge of the use of the ARMBRUSTER/STAGEWAY mark by Opposer. Even significantly discounting the Myers and Lester testimony because they are principals of Applicant and their testimony thus is self-serving, the clear, consistent testimony of these eight witnesses is a powerful counterweight to the testimony of Mr. Bakare, which in contrast is indefinite, internally inconsistent, and likewise self-serving.

A ninth witness, Samuel T. Rutherford, seemed to testify that ARMBRUSTER/ STAGEWAY vehicles were not manufactured after 1990, but his testimony on that point is insufficiently clear to carry probative weight. Mr. Rutherford has been an independent contractor for Opposer since 2000 and has been in the business of selling limousines and hearses or vehicles for the funeral industry for 30 years.[121] ARMBRUSTER/STAGEWAY was among the brands of vehicles Mr. Rutherford sold when he first entered the business in 1986, and he sold more than 10 of them between 1986 and 1995.[122] Mr. Rutherford testified that he was a dealer for rival limousine

---

[118] Floyd Test. at 7:7-11:16, 58 TTABVUE 12-16.

[119] *Id.* at 35:18-40:12, 58:25-59:17, 95:18-97:21, 58 TTABVUE 40-45, 63-64, 100-02.

[120] *Id.* at 66:8-13, 87:24-88:2, 58 TTABVUE 71, 92-93.

[121] Rutherford Test. at 5:15-6:3, 13:5-10, 42 TTABVUE 7-8, 15.

[122] *Id.* at 6:4-7:6, 11:2-11, 49:10-14, 42 TTABVUE 8-9, 13, 51. Mr. Rutherford did not testify specifically when within that time frame he sold the cars.

maker Federal Coach in New York from 1995 to 2000, but he also sold other cars during that time, including Opposer's.[123] He testified:

> Q.   From 1995 through 2000 when you were in New York, did you take Armbruster Stageway cars on trade?
>
> A.   No. Because they were – they stopped building them – they built them like in '90 something. I didn't – I didn't have a whole lot, no. I'll say no on that one. No.
>
> * * *
>
> Q.   So I just asked you from 1995 to 2000 if you had taken any Armbruster Stageway cars on trade. And I believe you responded, no, because they weren't making them anymore. Is that right?
>
> A.   No, because I haven't – I didn't take any on trade.[124]

All of the cars Mr. Rutherford has sold for Opposer since 2000 were branded Executive Coach Builders.[125] He has, however, seen ARMBRUSTER/STAGEWAY vehicles on the road up to the present time, testifying that New York was their biggest market: "They were the most popular limousine in the '80s. So they're still on the road. People don't trade limousines every year."[126]

Alone among the witnesses, Mr. Rutherford testified that he saw what appears to have been one of the six-door Cadillacs from the B & S Limo order when it came back in on trade for resale at Opposer's New Jersey location in approximately 2011 or 2012 and that it bore an ARMBRUSTER/STAGEWAY emblem.[127] He testified as follows:

---

[123] *Id.* at 11:12-12:16, 42 TTABVUE 13-14.

[124] *Id.* at 53:23-54:16, 42 TTABVUE 55-56.

[125] *Id.* at 72:4-13, 42 TTABVUE 74.

[126] *Id.* at 55:12-57:3, 42 TTABVUE 57-59.

[127] *Id.* at 18:16-20:24, 73:21-75:15 (as corrected), 42 TTABVUE 20-22, 75-77, 123.

Q.     Do you recall Executive Coach Builders ever manufacturing a vehicle which bore the name Armbruster Stageway?

A.     To my knowledge, they built several six-doors in 2008 and 2009 that bore the name.

Q.     Why do you say that?

A.     Because I know I saw one of the vehicles in New Jersey and it had that name on it.

Q.     Tell us more about that, about the situation in New Jersey.

A.     They had several of the vehicles there in New Jersey, six-doors, that they had. I think they came back off of trade, I think. I don't know who owned them. I think they came back off trade and they were trying to resell them. Something like that, I believe.

Q.     And tell me again what year you saw these vehicles.

A.     I want to say somewhere maybe around 2011, maybe. 2012, maybe. Somewhere around there, maybe.

Q.     And in those vehicles you saw in 2011 or 2012, what caused you to believe that they had been manufactured in 2008 or 2009?

A.     That was the years of the vehicles.

Q.     How do you know that?

A.     That's what I was told. Did I go look at it or copy a VIN number down? No.

Q.     And how many vehicles did you recall seeing which bore the name Armbruster Stageway?

A.     I think I saw one that bore the name of it. They had a lot of vehicles there. They had Lincolns. They had Cadillacs. They had some other vehicles there, some other VIP limousines there. I seen one, I think.

Q.  And what led you to believe that these vehicles bore the name Armbruster Stageway that you saw in 2011 and 2012?

A.  Typically, when you have a limousine, you brand it with the manufacturer's name on it with a little plastic decal. You can either put it on the side of the vehicle or you put it on the back of the trunk area. And I believe – I believe on the left side on the back there was an emblem there stating that.

Q.  How many doors did the vehicle have that bore the name Armbruster Stageway?

A.  It was straight six doors.

Q.  What vehicle was it based upon? Was this a Mercedes? A Lincoln?

A.  No.

Q.  What?

A.  They were Cadillacs.[128]

Contrary to Mr. Rutherford's testimony, however, as detailed *supra*, both Mr. Bakare and Mr. Zachary – who actually sold to B & S the six-door Cadillac limousines Opposer made in 2009[129] – testified that those cars were not branded ARMBRUSTER/STAGEWAY at manufacture. Mr. Zachary, general manager of Opposer's dealership in New Jersey, also testified that he had not seen a car with that mark at his location since he began work there in 2002.[130]

---

[128] Rutherford Test. at 18:16-20:17, 42 TTABVUE 20-22.

[129] *See* Zachary Test. at 26:24-27:3, 60:22-61:6, 45 TTABVUE 28-29, 62-63.

[130] *Id*. at 53:4-7, 45 TTABVUE 55.

In addition, Mr. Price and Mr. Lankford testified that they took this entire order of cars in on trade in New Jersey from B & S Limo a few years after their manufacture, and they did not have the ARMBRUSTER/STAGEWAY mark. Mr. Lankford testified that his company had bidden unsuccessfully on B & S Limo's 2009 order of 10 six-door limousines, the bid won by Opposer.[131] Mr. Lankford testified that B & S Limo contacted him a few years later and in approximately October 2013, as part of a winning bid for new cars, he took all 10 of the cars Opposer had made for B & S in 2009 on trade and visually inspected them.[132] He recalled no visible branding (besides Cadillac) on the interior or exterior of the cars, other than Opposer's name on the doorjamb stickers, and saw no reference on them to ARMBRUSTER/STAGEWAY.[133] Mr. Lankford identified pictures of one of those cars for sale on his company's website and doorjamb stickers naming Executive Coach Builders, Inc. as the manufacturer.[134] Mr. Price also testified that he saw nine to ten of the cars manufactured by Opposer for B & S Limo when they came back on trade to Mr. Lankford's Heritage Coach Company some two years before his deposition, and they were not branded:

> Q.　So you saw the cars when they came back on trade; is that right?
>
> A.　Correct.

---

[131] Jay Lankford Test. at 42:1-43:22, 68 TTABVUE 47-48.

[132] *Id.* at 50:8-53:5, 68 TTABVUE 55-58.

[133] *Id.* at 53:6-15, 65:3-6, 70:3-8, 68 TTABVUE 58, 70, 75.

[134] *Id.* at 72:9-75:13 and Exhibit 46, 68 TTABVUE 77-80, 88-111.

Q. And when you think back on those cars, were those cars branded Executive Coach Builders?

A. They were not branded.

Q. They were not branded. So you don't recall seeing any emblems on them?

A. There was not an emblem on them.

Q. Okay.

A. I know specifically, because it took us forever to figure out what they were.

Q. Okay. And those are the only six doors [produced by Opposer] that you have ever seen?

A. Ever.

Q. Did you inspect the door jamb or any of the other stickers on the interior of the car?

A. We were looking everywhere on the car for it for a good 40 minutes.

Q. Huh. And when you say "we," you mean you and –

A. Jay Lan[k]ford.[135]

Mr. Price determined that the cars were built by Opposer by calling the original dealer in Connecticut who had special ordered them from Opposer.[136] He was "Absolutely. One hundred percent positive" that there was no reference to ARMBRUSTER/STAGEWAY on the cars.[137]

---

[135] Price Test. at 49:12-53:16, 60 TTABVUE 54-58; *see also id.* at 67:18-69:21, 60 TTABVUE 72-74.

[136] *Id.* at 52:14-53:8, 60 TTABVUE 57-58.

[137] *Id.* at 53:12-16, 60 TTABVUE 58.

Considering all of the record evidence, we find Mr. Rutherford's testimony that he saw the ARMBRUSTER/STAGEWAY mark in approximately 2011 or 2012 in New Jersey on a six-door Cadillac, one of several built in 2008 and 2009 that had come back in on trade, to be outweighed by the consistent testimony of four other witnesses with firsthand knowledge who testified that the group of six-door Cadillacs in the order by B & S Limo did not bear the mark. To the extent Mr. Rutherford may have been testifying regarding a different set of "several" six-door Cadillacs built by Opposer in 2008 and 2009 that came back off trade in New Jersey in 2011 or 2012 and were marked ARMBRUSTER/STAGEWAY, there is no other testimonial or documentary evidence establishing that the mark was used on a group of several vehicles at once in that time frame.[138]

Overall, Mr. Bakare's testimony is consistent with a subjective desire to reserve a right in the ARMBRUSTER/STAGEWAY mark. *Contra Imperial Tobacco Ltd. v. Philip Morris Inc.*, 899 F.2d 1575, 14 USPQ2d 1390, 1394 (Fed. Cir. 1990) ("[T]he Lanham Act was not intended to provide a warehouse for unused marks."). Mr. Bakare referred to ARMBRUSTER/STAGEWAY as a name "which we have in our back pocket,"[139] and discussed the need to preserve the name for "relaunch" in

---

[138] This includes the testimony filed under seal of Raymond T. Bush, program manager of the Cadillac Professional Vehicle Program, with exhibits. 66 TTABVUE 30 (confidential). *Cf.* Zachary Test. at 60:11-62:15, 45 TTABVUE 62-64 (discussing research Opposer conducted for the B & S Limo order, and testifying: "Q. So you're saying that [Opposer] may have produced the odd one six-door here or there, but they never produced more than one for a single customer? A. To my knowledge, no, they have not. But Executive Coach has been around for 40 years, I couldn't say they never have.").

[139] Bakare Trial Test. at 164:4-8, 50 TTABVUE 166.

the funeral market. This is particularly clear in Mr. Bakare's trial testimony concerning the domain names <armbrusterstageway.com> and <armbruster stagewaylimousines.com>, which were first registered on Opposer's behalf in December 2009 by Thomas Zachary, the general manager of Opposer's East Coast dealership.[140] Mr. Bakare testified as follows:

> Q. Did you play a role in the purchasing of these two domain names, the ArmbrusterStageway Limousines.com . . . and ArmbrusterStageway.com?
>
> A. Yes. I instructed him [Mr. Zachary] to go out and acquire the name and get the process rolling.
>
> Q. What process?
>
> A. The process of trying to – the process of registering the domain name and getting the Armbruster/Stageway name kind of relaunched, so to speak.
>
> Q. And when you say "relaunched," tell us, expand on that. What do you mean, relaunched?
>
> A. Generally, because Armbruster/Stageway is a very strong name in the funeral industry because of its long history and being the oldest – it's one of the oldest, if not the oldest name in the industry. So it gives an advantage when you enter that industry because everybody knows who you are.
>       *So we've been preserving it for the right product and the right time to make a reentry.* Rather than just say sort of entry, a major reentry into that market. And that's what – that's why we – that's why we kind of set up that website and I say, Okay, let's get started. We're about to do this.
>
> Q. And you said reenter "that market." When you say "that market," what are you referring to?
>
> A. Well, I want to say "reenter that market." Even though we are in that market, we enter as a full-

---

[140] *See* Exhibits 14-16 to Bakare Trial Test., 50 TTABVUE 477-514.

> scale, full-blown production branding of that, as opposed to just using two companies in one. We're actually going to actually separate Executive Coach from Armbruster/Stageway and actually use Armbruster as a marketing tool for that funeral line, for the funeral market.[141] (emphasis added).

As noted *supra*, Opposer decided not to proceed with the "relaunch" at that time.

Testimony by Samuel T. Rutherford, an independent contractor for Opposer since 2000, similarly supports the conclusion that Opposer was not using the ARMBRUSTER/STAGEWAY name but "reserving" it for reentry into the funeral market. Mr. Rutherford testified that he saw ARMBRUSTER/STAGEWAY items when he first visited Opposer's plant in 2000, prompting this exchange with Mr. Bakare:

> I asked him did he know the history of Armbruster Stageway. He told me no. And I explained to him about the strong point of how it started in 1887 and that, you know, it has a strong name in the funeral industry and that *if he ever was deciding to do a line in the funeral line, that that would be the name to go under.* You have instant name recognition.[142] (emphasis added).

Mr. Rutherford further testified:

> Q.    Did you have any specific discussions with Mr. Bakare in September of 2000 about manufacturing a vehicle for the funeral industry bearing the Armbruster Stageway name?
>
> A.    I did. I did. I told him that he ought to look into the funeral industry because that is a very strong industry and it's more steadier than the VIP side of it.

---

[141] Bakare Trial Test. at 61:8-62:18, 50 TTABVUE 63-64.

[142] Rutherford Test. at 15:7-16:9, 42 TTABVUE 17-18.

> That was very – it was up and down. It was very cyclical. It was never steady, where the funeral industry was steady. So I discussed that with him at that point.[143]

Viewed as a whole, we find that a preponderance of the evidence supports the conclusion that the ARMBRUSTER/STAGEWAY mark was not used on vehicles in the ordinary course of trade after Opposer purchased the company in 1993. *See West Florida Seafood*, 31 USPQ2d at 1663 (directing that "one should look at the evidence as a whole, as if each piece of evidence were part of a puzzle which, when fitted together, establishes prior use").[144]

> 2. Use of the ARMBRUSTER/STAGEWAY Mark Other Than on Cars

In addition to use on cars themselves, Opposer asserts that it has used the ARMBRUSTER/STAGEWAY mark in other ways in connection with custom vehicle manufacturing and sales services; indeed, Mr. Bakare testified that Opposer has always operated as "two companies in one," Executive Coach and Armbruster/ Stageway.[145] There is record evidence that the latter mark was used on Opposer's vehicle warranty manual; on signs, plaques, and memorabilia displayed in Opposer's plant; on a trade show banner in the late 2000s or shortly thereafter; in the domain names <armbrusterstageway.com> and <armbrusterstagewaylimousines.com>, first

---

[143] *Id.* at 17:14-25, 42 TTABVUE 19.

[144] Even were we to find that the nonuse period began in 1997 (after the only ARMBRUSTER/ STAGEWAY advertising of record expired) or 1998 (when Opposer's production expanded but it was making "very few" ARMBRUSTER/STAGEWAY cars, as noted *supra*), it would not change the result in view of the lengthy period of nonuse.

[145] *See, e.g.*, Bakare Trial Test. at 21:1-25, 50 TTABVUE 23.

registered by Thomas Zachary on Opposer's behalf in 2009, as discussed *supra*; and in association with replacement parts. We address each in turn.[146]

Warranty Manuals. The cover letter to the warranty manual accompanying Opposer's cars began: "Executive Coach Builders Inc. and Armbruster Stageway's (Hereafter called ECB), limited warranty and claim procedures on limousine conversions built after March Sixteenth Nineteen-Ninety Three is as listed below:"[147]



---

[146] Applicant characterizes some of these as claimed analogous uses, but Opposer neither pled nor argued that it has priority through use of ARMBRUSTER/STAGEWAY analogous to trademark use. *See Cent. Garden & Pet Co. v. Doskocil Mfg. Co.*, 108 USPQ2d 1134, 1142 (TTAB 2013) (stating that reliance on priority through analogous use must be pleaded).

[147] Exhibit 8 to Bakare Trial Test., 50 TTABVUE 311-16.

The only such warranty of record (above) is dated February 1994, two months after Mr. Bakare bought Opposer.[148] Mr. Bakare testified that the warranty had been updated, "but generally the cover letter has always been the same" from 1993 until the Armbruster Stageway name was removed between 2011 and 2013.[149]

Signs, Plaques, and Memorabilia at Opposer's Plant.[150] There is evidence that the following two ARMBRUSTER/STAGEWAY signs hang inside Opposer's current manufacturing facility, as they have in each of its previous plants:[151]



---

[148] Bakare Trial Test. At 253: 18-22, 50 TTABVUE 255.

[149] *Id.* at 35:3:16, 193:9-196:23, 50 TTABVUE 37-39, 195-98.

[150] Exhibit 10 to Bakare Trial Test., Parts 1-3, 50 TTABVUE 438-48; *see also* Exhibits 21 and 29 to Bakare Discovery Test., 41 TTABVUE 473-90, 563-64.

[151] Bakare Trial Test. at 20:14-22:21, 50 TTABVUE 22-24, 438-48; *see also* Bakare Discovery Test. at 147:8-152:20, 41 TTABVUE 149-54; Floyd Test. at 38:20-39:4, 40:17-20, 81:7-11, 58 TTABVUE 43-45, 86.

Mr. Bakare testified that customers take tours of Opposer's manufacturing facility, and when he gives tours, "the very first thing I will point to is that sign" immediately *supra*.[152] Mr. Floyd and Mr. Dutcher testified that they and other sales associates also gave customer tours of the plant when they worked for Opposer.[153]

In the next photo, the sign on the left states "Armbruster Stageway Springfield, MO," while the sign on the right states "Executive Coachbuilders Springfield, MO":



In addition, items on the walls in Opposer's conference and refreshment rooms include the following plaques, dated 1995 and 1997, from the Cadillac Master Coachbuilder program, with both Opposer's name and ARMBRUSTER/STAGEWAY:

---

[152] Bakare Discovery Test. at 145:8-152:20, 41 TTABVUE 147-54; *see also* Bakare Trial Test. at 24:24-32:12, 50 TTABVUE 26-34.

[153] *See* Floyd Test. at 40:21-43:7, 58 TTABVUE 45-48; Dutcher Test. at 27:11-29:19, 56 TTABVUE 32-34.

 

Also displayed is this poster, "Celebrating over a Century of Custom Vehicle Excellence . . ." with the ARMBRUSTER/STAGEWAY logo and years 1887-1987:[154]



---

[154] *See* Bakare Trial Test. at 22:22-34:2 and Exhibit 10, Parts 3-5, 50 TTABVUE 24-36, 449-60; Bakare Discovery Test. at 152:21-161:7, 41 TTABVUE 154-63.

In more context, these plaques and memorabilia appear as follows, with the conference room display above and the break room display below:





Mr. Bakare testified that customers visiting Opposer's plant would see all of the areas where these signs, plaques, and memorabilia were displayed.[155]

---

[155] *See* Bakare Discovery Test. at 144:4-158:12, 41 TTABVUE 146-60; Bakare Trial Test. at 24:9-34:2, 50 TTABVUE 26-36.

Trade Show Banner. Jerry Dutcher, who worked in sales for Opposer from 2005 to 2013, testified that he has attended LCT and Limo Digest trade shows.[156] Although he saw no ARMBRUSTER/STAGEWAY cars produced by Opposer at any trade show, "I know we had a banner at one time, when everybody hangs banners at the show. I believe we had a banner that said Armbruster like years ago."[157] Mr. Dutcher, who testified in April 2016, estimated that he had seen such a banner "in that general area where Executive was at," probably in 2010 or 2011, "[s]omewhere in there,"[158] or in the late 2000s.[159]

This testimony is generally contradicted by Mr. Bakare's discovery testimony as Opposer's corporate representative. Mr. Bakare testified in part as follows regarding the annual LCT ("Limousine and Chauffeur Transportation") and Limo Digest trade shows Opposer attends:

> Q.    [ ] Do you have any kind of backdrop or anything that you hang?
>
> A.    Sometimes we have a – a big banner. Sometime – most of the time we have a – a banner with the name of the – of the car itself that's standing behind it.
>
> Q.    Okay. What does the big banner that you bring say?
>
> A.    Banners usually have the name of the car and the Executive Coach logo.
>
> Q.    Okay. Is there any other banners or signages that you have up at these shows?

---

[156] Dutcher Test. at 14:15-15:7, 43:14-18, 56 TTABVUE 19-20, 48.

[157] *Id.* at 39:14-40:1, 56 TTABVUE 44-45.

[158] *Id.* at 40:7-15, 56 TTABVUE 45.

[159] *See id.* at 75:7-77:16, 84:6-86:18, 56 TTABVUE 80-82, 89-91.

A.  No, because those are limousine shows, so it's predominantly limousine shows, so we predominantly exhibit our limousines over there.

Q.  Okay.

A.  Armbruster is more of a funeral car.

* * *

Q.  Funeral. I'm sorry.

A.  I'm sorry. Funeral car, and probably two percent of the buyers there – maybe 10 percent, I should say, are people that are interested in funeral cars.

Q.  Okay.

A.  So we just showcase while – you know, we cater to 90 percent of the audience, so to speak, that know the limousine.[160]

Nonetheless, we give some probative weight to Mr. Dutcher's testimony that he once saw a banner at a trade show with the ARMBRUSTER/STAGEWAY mark sometime between the late 2000s and 2011.

Domain Names. As discussed *supra*, Mr. Bakare and Mr. Zachary both testified that the domain names <armbrusterstageway.com> and <armbrusterstageway limousines.com> were first registered on Opposer's behalf on December 15, 2009 in association with the B & S Limo order of funeral cars.[161] Opposer registered the names in preparation to "relaunch" the ARMBRUSTER/STAGEWAY name for a new line of funeral cars, but did not use the mark on the cars made for B & S Limo or

---

[160] Bakare Discovery Test. at 129:5-131:16, 41 TTABVUE 131-33.

[161] *See* Bakare Trial Test. at 61:8-64:18, 50 TTABVUE 63-66; Bakare Discovery Test. at 170:8-172:11, 41 TTABVUE 172-74; Zachary Test. at 14:7-18:5, 45 TTABVUE 16-20.

otherwise proceed with relaunch of the mark at that time.[162] These two domain name registrations expired on December 15, 2012.[163] Opposer has "always" had a website at the domain name <ecblimo.com>.[164]

Opposer does not claim, and there is no evidence, that the ARMBRUSTER/ STAGEWAY mark ever appeared in text or on any cars posted to the websites at <armbrusterstageway.com> and <armbrusterstagewaylimousines.com>.[165] A picture of one of the cars built with the B & S Limo order was posted on those sites in September 2010 under the title "New ECB Six Door," with text stating in part: "Executive Coach enters the funeral car market with this six door Cadillac."[166]

Replacement Parts. Opposer argues that it provides "(a) retail and wholesale store services featuring both limousines and replacement parts and (b) custom limousine manufacturing services."[167] The replacement parts, such as glass, are for ARMBRUSTER/STAGEWAY vehicles, but are not themselves branded ARMBRUSTER/STAGEWAY.[168]

---

[162] *See id.*

[163] There was a one-day lapse before the domain names were re-registered in December 2011. *See* Exhibits 14-16 to Bakare Trial Test., 50 TTABVUE 477-514; Exhibit 6 to Zachary Test., 45 TTABVUE 123-54.

[164] Bakare Trial Test. at 201:20-202:21, 50 TTABVUE 203-04; *see also* Exhibit 14 to Bakare Discovery Test., 41 TTABVUE 297-460 (printouts from ecblimo.com).

[165] Zachary Test. at 18:22-26:8, 88:23-90:10 and Exhibits 4-5, 45 TTABVUE 20-28, 90-92, 117-22; *see also* Bakare Discovery Test. at 172:16-179:10 and Exhibits 22-23, 41 TTABVUE 174-81, 491-531.

[166] *Id.*

[167] Opposer's Brief at 9, 89 TTABVUE 10. Opposer's argument concerning custom manufacturing services is addressed *infra*.

[168] *See* Bakare Discovery Test. at 105:5-108:11, 41 TTABVUE 107-10; Bakare Trial Test. at 39:2-24, 43:18-46:19, 206:13-210:24, 50 TTABVUE 41, 45-48, 208-12.

Individually and collectively, we find that these isolated and de minimis uses of the ARMBRUSTER/STAGEWAY mark other than on vehicles are insufficient to constitute bona fide use of that mark in the ordinary course of trade.

In support of its arguments with respect to these types of uses, Opposer relies on two cases, the first being *Guiding Eyes for the Blind, Inc. v. Guide Dog Found. for the Blind, Inc.*, 384 F.2d 1016, 155 USPQ 462 (CCPA 1967). The facts of that case, however, are readily distinguishable from those before us. There, the parties both used the service mark GUIDING EYES in association with training and use of guide dogs for the blind, but the second user claimed the first user had abandoned the mark by replacing it with SECOND SIGHT. *Id.* at 462-63 & n.3. There was evidence that the first user of the GUIDING EYES mark decided in 1955 to continue using that mark in association with its services, but also to add the mark SECOND SIGHT. *Id.* at 463. The first user began using SECOND SIGHT on its letterheads, news releases, newsletters, advertisements, book marks, and membership cards. *Id.* A sign with the wording GUIDING EYES was moved to the interior of the first user's dog-training facility in 1955; the opinion does not state whether the newer mark appeared on the exterior of the facility. *Id.* Nonetheless, door plaques with the GUIDING EYES mark were used continuously on the first user's administrative offices and, in crucial divergence from the case before us, the GUIDING EYES mark was embossed on the harnesses and used on the identification tags for guide dogs and the identification cards supplied to blind persons using the dogs, and so used in rendering services. *Id.* at 463-64. The Board found that no period of actual non-use of the GUIDING EYES mark to identify the first user's services had been proved by the junior user claiming

abandonment, which had begun using the mark in 1956, and the Court of Customs and Patent Appeals agreed. *Id.* at 464.

Opposer's reliance on a second case, *Ritani, LLC v. Aghjayan*, 880 F. Supp. 2d 425 (S.D.N.Y. 2012), is similarly unavailing. In that case, the court denied a motion to dismiss, finding that the plaintiff had sufficiently pleaded and offered evidence of its rights in the word mark RITANI and a registered design mark called the Three-Leaf Trademark for jewelry, as well as common-law rights in the design mark based on 10 years of use: "The Three–Leaf Trademark has been displayed on Ritani's warranty cards, jewelry display cases at the point-of-sale, on advertisements and brochures, as well as on all letterhead, sales orders, t-shirts, business cards and shipping envelopes." *Id.* at 445. *Ritani* decided a motion to dismiss, not evidence of abandonment after a full trial. More important, except for the reference in its warranty manual,[169] Opposer did not make the types of uses listed in *Ritani* of the unregistered ARMBRUSTER/STAGEWAY mark, relying instead on EXECUTIVE COACH for advertising, sales, orders, etc. since it bought the business in 1993.

As discussed *supra*, there is no evidence that Opposer has used the ARMBRUSTER/STAGEWAY mark in advertising any goods or services since 1996 except for an appearance on one trade show banner between the late 2000s and 2011. Opposer does not argue that it took orders for ARMBRUSTER/STAGEWAY cars in association with that banner. *Cf. In re Shipley Co.*, 230 USPQ 691, 694 (TTAB 1986).

---

[169] Opposer asserts that use on the warranty manual was trademark use, not use as either a trade name or service mark. Reply Brief at 10 & n.5, 93 TTABVUE 11. Generally, warranting the performance of goods of one's own manufacture is not normally considered a service under the Lanham Act. *See In re Sun Valley Waterbeds Inc.*, 7 USPQ2d 1825, 1826 (TTAB 1988).

Considering Opposer's use of the domain names <armbrusterstageway.com> and <armbrusterstagewaylimousines.com>, these names *per se* merely indicate Internet addresses where Opposer's websites offering vehicles under the EXECUTIVE COACH mark could be found. Here, the domain names do not separately identify Opposer's goods or retail sales services. *See, e.g.*, *In re Roberts*, 87 USPQ2d 1474, 1479 (TTAB 2008); *In re Eilberg*, 49 USPQ2d 1955 (TTAB 1998). The sale of unbranded replacement parts for ARMBRUSTER/STAGEWAY cars also is insufficient to maintain rights in the mark. *See Gen. Motors Corp. v. Aristide & Co.*, *Antiquaire de Marques*, 87 USPQ2d 1179, 1186 (TTAB 2008) (finding that opposer abandoned rights in the LA SALLE mark for motor vehicles it had not sold since 1940 despite licensing replacement parts for those cars).

Finally, we find that the appearance of the ARMBRUSTER/STAGEWAY mark on interior signs, plaques, and memorabilia displayed inside Opposer's plant – all apparently dating to 1997 or earlier[170] – merely reflects the historical use of that mark on cars. See, for example, *Am. Photographic Publ'g Co. v. Ziff-Davis Publ'g Co.*, 135 F.2d 569, 57 USPQ 362, 364 (7th Cir. 1943), finding that use of the title "Popular Photography" and those of other predecessors on the masthead of subsequent publication "American Photography" did not prevent abandonment:

> The names of the periodicals listed under American Photography do not even purport, however, to represent existing publications. Commercially they are dead, and they are, at most, names of the ancestors of the present

---

[170] Dates on the poster and the two plaques are 1987, 1995, and 1997, respectively. As noted *supra*, Mr. Bakare testified that the two undated ARMBRUSTER/STAGEWAY signs have hung in his facilities since he bought the company in 1993. *See* Bakare Trial Test. at 22:1-7, 50 TTABVUE 24; Bakare Discovery Test. at 146:23-151:5, 41 TTABVUE 148-53.

> magazine. Like epitaphs on the tombstone in the family burial plot, they reflect an honored past; but their present function is merely to describe the history and background of "American Photography."

Even assuming such use on signs could be a sufficient basis for rights in a service mark, Opposer does not argue that it offers custom limousine manufacturing or other services for vehicles made by others, rather than in connection with the sale of its own goods. *See, e.g.*, *In re Advert. & Mktg. Dev. Inc.*, 821 F.2d 614, 2 USPQ2d 2010, 2014 (Fed. Cir. 1987) (defining a service as the performance of labor for the benefit of another).[171]

Viewed individually and together, we find that what Opposer identifies as its trademark and service mark use of ARMBRUSTER/STAGEWAY other than on vehicles does not constitute bona fide use of that mark by Opposer in the ordinary course of trade for either goods or services.

Based on all the evidence of record, we find that Applicant has established a prima facie case that Opposer abandoned the ARMBRUSTER/STAGEWAY mark through nonuse by at least 1996, that is, through nonuse for three consecutive years after Opposer apparently purchased the mark. Thus, there is a rebuttable presumption that Opposer abandoned the mark without intent to resume use.

The burden of production (*i.e.*, going forward) now shifts to Opposer to produce evidence that it has intended to resume use. *ShutEmDown Sports Inc. v. Lacy*, 102

---

[171] Opposer also does not argue that these signs constitute a point-of-sale display for its goods, as opposed to its purported attendant services of custom limousine manufacture and sales of replacement car parts. We have concluded by a preponderance of the evidence that there were no cars bearing the mark ARMBRUSTER/STAGEWAY in proximity to these historic signs and memorabilia, so it is not clear that customers could easily associate the mark with the goods. *In re Kohr Bros.*, 121 USPQ2d 1793, 1795 (TTAB 2017).

USPQ2D 1036, 1042-43 (TTAB 2012). We therefore turn to consider Opposer's evidence related to its putative intent to resume use.

B.      Opposer's Intent to Resume Use

An affirmative desire not to relinquish a mark is not determinative of the intent element of abandonment under the Trademark Act. "In every contested abandonment case, the respondent denies an intention to abandon its mark; otherwise there would be no contest." *Imperial Tobacco*, 14 USPQ2d at 1394; *see also Cerveceria Modelo S.A. de C.V. v. R.B. Marco & Sons Inc.*, 55 USPQ2d 1298 (TTAB 2000). Intent to resume use in abandonment cases has been equated with a showing of special circumstances which excuse a registrant's nonuse. *Imperial Tobacco*, 14 USPQ2d at 1395. If a mark owner's nonuse is excusable, it has overcome the presumption that its nonuse was coupled with an intent not to resume use; if the activities are insufficient to excuse nonuse, the presumption is not overcome. *See Cerveceria Centroamericana*, 13 USPQ2d at 1313.

To prove excusable nonuse, Opposer must produce evidence showing that, under the particular circumstances of the case, Opposer's activities are those that a reasonable business with a bona fide intent to use a mark in U.S. commerce would have undertaken. *Rivard v. Linville*, 45 USPQ2d at 1376. To that end, the Board has pointed out that plans must be to resume commercial use of a mark within the "reasonably foreseeable future." *See, e.g.*, *Hornby v. TJX Cos.*, 87 USPQ2d 1411, 1421-22 (TTAB 2008) (quoting *Silverman v. CBS Inc.*, 870 F.2d 40, 9 USPQ2d 1778, 1783 (2d Cir. 1989)); *Quality Candy Shoppes/Buddy Squirrel of Wisconsin Inc. v. Grande Foods*, 90 USPQ2d 1389, 1393 (TTAB 2007) (quoting *Stetson v. Howard D. Wolf &*

*Assocs.*, 955 F.2d 847, 21 USPQ2d 1783, 1785 (2d Cir. 1992)); *see also Emergency One Inc. v. American FireEagle Ltd.*, 228 F.3d 531, 56 USPQ2d 1343, 1347-48 (4th Cir. 2000) ("Requiring the owner to have an intent to use the mark in the reasonably foreseeable future ensures that valuable trademarks are in fact used in commerce as the Lanham Act intends, rather than simply hoarded or warehoused.").

We may consider evidence regarding practices that occurred before or after the three-year period of nonuse to infer intent to resume use during the three-year period. *Crash Dummy Movie LLC v. Mattel Inc.*, 601 F.3d 1387, 94 USPQ2d 1315, 1317 (Fed. Cir. 2010). Evidence of subsequent intent to resume use, however, does not rebut the presumption of abandonment. *See Cerveceria Centroamericana*, 13 USPQ2d at 1313.

In this case, there is no evidence that Opposer developed an intent to resume commercial use of the ARMBRUSTER/STAGEWAY mark in the reasonably foreseeable future within the three-year period of nonuse from 1993 to 1996.[172] This includes Opposer's ongoing display of interior signs and memorabilia, which we find neither constitutes a plan to resume use nor demonstrates activities that would support a showing of an intent to resume use within the reasonably foreseeable future. *Cf., e.g., Silverman v. CBS*:

> A proprietor who temporarily suspends use of a mark can rebut the presumption of abandonment by showing reasonable grounds for the suspension and plans to resume use in the reasonably foreseeable future when the conditions requiring suspension abate. [citations omitted.] But a proprietor may not protect a mark if he discontinues using it for more than 20 years and has no plans to use or

---

[172] There is evidence discussed *supra* that Opposer considered "bringing back" the ARMBRUSTER/STAGEWAY mark in 2009 but, as explained, it did not do so.

> permit its use in the reasonably foreseeable future. A bare
> assertion of possible future use is not enough.

9 USPQ2d at 1783.

Opposer did develop plans to resume commercial use of the mark on vehicles within the reasonably foreseeable future in 2012, when it began preparing to use the mark for a combination limousine and hearse based on the Mercedes-Benz Sprinter. Opposer's use, however, would have constituted a new and separate use that did not cure the abandonment. *See, e.g.*, *Hornby*, 87 USPQ2d at 1422; *Auburn Farms Inc. v. McKee Foods Corp.*, 51 USPQ2d 1439, 1445 (TTAB 1999); *Stromgren Supports Inc. v. Bike Athletic Co.*, 43 USPQ2d 1100, 1112 (TTAB 1997); *Parfums Nautee Ltd. v. Am. Int'l Indus.*, 22 USPQ2d 1306, 1310 (TTAB 1992). We find that Opposer abandoned the ARMBRUSTER/STAGEWAY mark by 1996 and did not resume use of the mark before Applicant's constructive priority date of December 4, 2012.

## VII. Conclusion

After carefully considering the briefs and the record as a whole, we conclude that Applicant has established by a preponderance of the evidence that Opposer abandoned the ARMBRUSTER/STAGEWAY mark. Opposer did not establish a date of priority before Applicant's, an essential element of any claim under Trademark Act Section 2(d). We need not reach the issue of likelihood of confusion because without proof of its priority, Opposer cannot prevail.

**Decision***:* The opposition is dismissed.

Appendix

For the reader's ease of reference, the Board includes the following appendix listing some of the more significant dates in this proceeding. The appendix is not part of the evidentiary record and is intended for illustrative purposes only.

1887: Armbruster & Company begins building stagecoaches in Fort Smith, Arkansas.

1920s: Armbruster & Company starts building stretch limousines.

1966: Armbruster & Company merges with Stageway Coaches to form Armbruster/Stageway, Inc.

Late 1980s: Armbruster/Stageway, Inc. is sold to M.J. Rosenthal & Associates and Merrill Lynch Interfunding, which also owns rival limousine maker Executive Coach Builders of Springfield, Missouri. Production of Armbruster/Stageway vehicles moves to Missouri. Arkansas plants are sold to third-party competitor Federal Coach.

June 2, 1989: Executive Coachbuilders, L.P. applies to register ARMBRUSTER/ STAGEWAY mark.

1990: Both Executive Coach Builders and Armbruster/Stageway are acquired by R. J. Farris Associates, Inc.

February 16, 1990: Application to register ARMBRUSTER/STAGEWAY mark is abandoned for failure to respond or late response.

August 24, 1990: R. J. Farris registers ARMBRUSTER/STAGEWAYS [sic] as a fictitious name with the state of Missouri.

1993: Opposer's current owner and president, David Bakare, purchases the assets of Executive Coach Builders, including ARMBRUSTER/STAGEWAY mark.

2007: Applicant SPV Coach Company, Inc. is formed by Myers, its sole shareholder.

2008-2012: Applicant builds its own funeral limousines and hearses under mark SPV COACH COMPANY in Kansas.

2009-10: Opposer manufactures several funeral cars for B & S Limo.

October 17, 2009: Missouri fictitious name registration for ARMBRUSTER/ STAGEWAYS expires.

December 15, 2009: Opposer registers domain names <armbrusterstageway.com> and <armbrusterstagewaylimousines.com>.

2010: Federal Coach leaves former Armbruster/Stageway plants in Arkansas and moves to Ohio.

December 4, 2012: Applicant files subject application for ARMBRUSTER STAGEWAY mark pursuant to Trademark Act Section 1(b).

December 15, 2012: Domain names <armbrusterstageway.com> and <armbrusterstagewaylimousines.com> expire.

May 2013: Applicant, which has moved production to Fort Smith, Arkansas area, begins offering funeral cars under ARMBRUSTER STAGEWAY mark.

September 2013: Opposition proceeding filed.

November 2013: Opposer completes manufacture of Mercedes-Benz Sprinter family coach, on which it intended to use ARMBRUSTER/STAGEWAY mark.